On August 7, 2006, W. Randall Mullis ("the husband") and Lynda Marie Mullis ("the wife") were divorced by the Baldwin Circuit Court. The trial court awarded the husband and the wife joint legal custody of the Mullises' two children, with the husband having physical custody of the children. The husband was ordered to pay the wife $600 per month in periodic alimony, and the wife was ordered to pay the husband $307 per month in child support. The husband was also ordered to pay the wife $2,500 to purchase a vehicle. The husband was awarded possession and ownership of the marital residence, rental property, and business property owned by the couple but was ordered to pay the wife $40,000 as a property settlement.
The wife appealed, arguing that the trial court's property division was inequitable and that the trial court erred by awarding physical custody of the children to the husband. The Court of Civil Appeals affirmed the trial court's custody award, but it reversed the trial court's property division, holding that the division was inequitable. Mullis v.Mullis, 994 So.2d 934 (Ala.Civ.App. 2007). The husband then petitioned this Court for a writ of certiorari, arguing that the Court of Civil Appeals' reversal of the property division conflicts with this Court's holding in Ex parte Foley,864 So.2d 1094 (Ala. 2003). We granted the husband's petition for the writ of certiorari, and we now affirm the judgment of the Court of Civil Appeals.
The husband and wife were married on June 25, 1995, although they had cohabited since June 1990.[1] On February 18, 2005, the husband filed a complaint for divorce seeking custody of the children. The wife answered and filed a counterclaim for divorce in which she also sought custody of the children. On June 14, 2005, after an hearing held on June 7, 2005, at which evidence was presented ore tenus, the trial court entered an order awarding temporary custody of the children to the husband and awarding the husband temporary exclusive possession of the marital home.
On March 24, 2006, and July 7, 2006, the trial court held hearings on the husband's and the wife's complaints for divorce. As the Court of Civil Appeals summarized:
 "The trial court conducted several ore tenus hearings in this case. The testimony and documentary evidence from those hearings revealed the following pertinent facts. At the time of the final hearing in this matter, the [husband] was 43 years old and the [wife] was 53 years old. This is the [wife's] second marriage. The [wife] has four children from her previous marriage, but she does not have custody of those children. The [husband] has one child with special needs from a previous marriage, but he does not have custody of that child.
 "The parties separated in November 2003 when the [husband] moved out of the marital home. The [husband] returned to the marital home approximately three weeks after the trial court awarded him temporary custody of the children and possession of the marital home on June 14, 2005. The [husband] testified that when he returned to the house he discovered that the [wife] had left the house in a filthy condition. The [husband] submitted numerous photographs into evidence at trial depicting an unkempt house with trash strewn and clothes piled on the floor. The [wife] denied leaving the house in the condition *Page 944 
as depicted in the pictures admitted into evidence. The [wife] claimed that she kept the house clean while she had custody of the children.
 "The [husband] testified that he also found marijuana and numerous prescription pills loose in the house when he was cleaning the house. The [husband] explained that he took the pills he found to a pharmacist and learned that the pills were `uppers' of various kinds. The [husband] submitted as evidence a bottle containing various types of pills and what appears to be stems of marijuana the [husband] found while cleaning the marital home.
 "The [husband] and the [wife] both admitted to abusing illegal drugs in the past. The record revealed that the [husband] had been convicted in 1997 for possession of marijuana. The [husband] testified that he had previously abused methamphetamine and marijuana but that he had stopped abusing drugs several years before the final hearing in this case. According to the [husband], the [wife] continued to smoke marijuana. The [wife] testified that she and the [husband] used to smoke marijuana together, but she testified that she no longer smokes marijuana. The [wife] denied having a drug problem. The [wife] testified that she had consistently tested negative for drugs on drug screens administered to her after the initial hearings were held in the case.
 "The record reveals that the evening before the June 7, 2005, temporary hearing, the [wife] was arrested and charged with possession of a controlled substance. According to her testimony, the [wife] was arrested two blocks from the marital home with Xanax, a prescription drug, in her possession. At the time the [wife] was arrested, she did not have a prescription in her name for Xanax. The [wife] explained that she had had a prescription for the Xanax found in her possession but that her prescription had expired. The [wife] later pleaded guilty to a lesser charge of illegal possession of a prescription drug and was sentenced to two years' probation.
 "The [husband] testified that the [wife] did not consistently exercise visitation with the children after he received temporary custody of the children in June 2005. According to the [husband], the [wife] frequently declined to exercise overnight visitation with the children on Wednesdays and missed several scheduled weekend visitations. The [wife] testified that the [husband] made it difficult for her to exercise visitation with the children and, at times, refused to allow her to visit with the children. According to the [wife], she did not consistently exercise overnight visitation with the children on Wednesdays because she thought it best for the children to wake up in their own beds during the school week. The [wife] testified that she missed visitation one weekend in August 2005 because of a mandatory evacuation for Hurricane Katrina.[2] The [wife] testified that she had not paid child support to the [husband] since the [husband] received temporary custody of the children.
 "The [husband] testified that the [wife] had moved four times during the year preceding the final hearing in this case and that he did not know where the [wife] was living at the time of the final hearing. Testimony presented over the course of several ore tenus hearings held in this case revealed that the [wife] had moved several times. At the time *Page 945 
of the final hearing, the [wife] was living with her friend, Jill Richburg, and Richburg's two children. The [wife] testified that she paid Richburg $200 a week for rent.
 "Testimony revealed that the [wife] worked outside and inside the home during the parties' marriage. The [wife] testified that when she was not employed as a preschool teacher, she worked at home and handled all of the telephone calls for the [husband's] plumbing business. The [wife] testified that she began substitute teaching at a private school in 1994 and worked there for approximately 10 years. The [wife] testified that her employment at the school guaranteed that the children could attend the school without paying tuition. After leaving her employment at the school, the [wife] worked for a child-development center, but she was fired from that job in March 2006. The [wife] testified at the final hearing that she had a full-time job working 40 to 48 hours a week, earning $9 per hour. The [wife] listed her gross monthly income as $1,560 in her CS-41 child-support income affidavit filed in the trial court.
 "The [husband] is a self-employed plumber and owns Coastal Plumbing and Heating. The [husband] testified that he charges $78.50 an hour but that he typically performs contract work and is paid a flat rate for his services. The [husband] testified that his gross monthly income, including rental income he receives from commercial property and residential property he owns, is $3,700 a month. The [husband] testified that after he pays expenses associated with the rental properties, his monthly income is reduced to approximately $1,700.
 "The parties purchased their marital home in December 2000. The [husband] testified that the marital home had been appraised for $230,000. The [husband] testified that $100,000 of mortgage indebtedness remains on the marital home. The [husband] testified that the monthly mortgage payment on the marital home was $947.
 "In addition to the marital home, the parties own real property located on Fort Morgan Road in Gulf Shores (hereinafter `the Fort Morgan property'). The [husband] testified that a commercial building, a rental house, and the shop for his plumbing business all sit on the Fort Morgan property. The [husband] estimated the total value of the Fort Morgan property to be $300,000. The [husband] testified that the Fort Morgan property was subject to mortgage indebtedness of $197,000 and that his monthly mortgage payment on the property was $1,422.44.
 "The trial court heard limited testimony regarding other marital assets. The [wife] testified that the [husband] left her a 1995 GMC Jimmy [sport-utility vehicle] to drive after the parties' separation. The [husband] testified that he owned the vehicle. No value was given for the vehicle, but the [wife] testified that the vehicle was inoperable and had been inoperable for some time. At the time of the final hearing, the [husband] had the vehicle in his possession. The [husband] and the [wife] both presented testimony from character witnesses who testified in favor of their respective abilities to parent the children."
994 So.2d at 937-39. The evidence presented during the ore tenus hearings indicated that before the divorce the wife had removed money from the one of the children's savings account. The evidence also indicated that after the parties separated the wife fraudulently withdrew approximately $1,800 from the husband's business checking account; the bank, however, replaced *Page 946 
the funds that the wife fraudulently withdrew.
 "The standard appellate courts apply in reviewing a trial court's judgment awarding alimony and dividing property is well established:
 "`A trial court's determination as to alimony and the division of property following an ore tenus presentation of the evidence is presumed correct. Parrish v. Parrish, 617 So.2d 1036
(Ala.Civ.App. 1993). Moreover, issues of alimony and property division must be considered together, and the trial court's judgment will not be disturbed absent a finding that it is unsupported by the evidence so as to amount to an abuse of discretion. Id.
"Morgan v. Morgan, 686 So.2d 308, 310
(Ala.Civ.App. 1996). . . .
 "`The trial court has wide discretion over alimony and the division of property, and it may use whatever means are reasonable and necessary to equitably divide the parties' property. Grimsley v. Grimsley, 545 So.2d 75, 77 (Ala.Civ.App. 1989). Its judgment is presumed correct and will not be reversed unless it is so unsupported by the evidence . . . as to be unjust and palpably wrong. Grimsley, 545 So.2d at 76. However, that judgment is subject to review and revision. Moody v. Moody, 641 So.2d 818, 820
(Ala.Civ.App. 1994). This court must consider the issues of property division and alimony together when reviewing the decision of the trial court, Albertson v. Albertson, 678 So.2d 118, 120
(Ala.Civ.App. 1996), and, because the facts and circumstances of each divorce case are different, this court must also consider the particular facts and circumstances of the case being reviewed. Murphy v. Murphy, 624 So.2d 620, 623
(Ala.Civ.App. 1993).'
 "Bushnell v. Bushnell, 713 So.2d 962, 964-65
(Ala.Civ.App. 1997)."
Ex parte Drummond, 785 So.2d 358, 360-61 (Ala. 2000).
In reversing the trial court's division of property, the Court of Civil Appeals relied on its decision in Courtright v.Courtright, 757 So.2d 453 (Ala.Civ.App. 2000). InCourtright, the Court of Civil Appeals stated:
 "The trial court's judgment on . . . issues [of property division and alimony] will not be reversed absent a finding that the judgment is so unsupported by the evidence as to amount to an abuse of discretion. . . . The property division need not be equal, but it must be equitable. . . . The factors the trial court should consider in dividing the marital property include `the ages and health of the parties, the length of their marriage, their station in life and their future prospects, their standard of living and each party's potential for maintaining that standard after the divorce, the value and type of property they own, and the source of their common property.'"
757 So.2d at 456 (quoting Covington v. Covington,675 So.2d 436, 438 (Ala.Civ.App. 1996)).
The Court of Civil Appeals noted that the husband is 43 years old and the wife is 53 years old. Both the husband and the wife are employed; the husband earns approximately $3,700 per month while the wife earns approximately $1,560 per month. The parties owned real property worth $530,000 that was subject to mortgage indebtedness in the amount of $297,000. Considering the net worth of the marital property, the Court of Civil Appeals noted that the trial court awarded the husband approximately 81.8% of the parties' net worth while the mother was awarded 18.2% of the parties' net worth.994 So.2d at 939-40. The Court of Civil *Page 947 
Appeals thus held that the division of the marital assets was inequitable "[g]iven the length of the parties' marriage, the parties' future prospects, and the value and type of the marital property." Mullis, 994 So.2d at 940.
The husband argues that the Court of Civil Appeals' judgment conflicts with this Court's opinion in Ex parte Foley, supra. In Foley, a couple divorced, and a portion of the marital property was divided in accordance with an agreement entered into by the parties. The trial court, however, divided marital property not included in the agreement, which consisted primarily of the husband's retirement accounts totaling approximately $250,000. The trial court awarded the wife $46,000 of the husband's combined retirement accounts. The Court of Civil Appeals reversed the trial court's judgment, concluding that the property division was inequitable because the parties had been married for 28 years, during which the husband had accumulated a substantial pension, and because the wife had not worked outside the home during the marriage, was not a high school graduate, had no prospects for future employment, and had no pension of her own. The Court of Civil Appeals placed great weight on the wife's allegations of infidelity and abuse by the husband, although there was testimony disputing those allegations during the trial. This Court, in turn, reversed the judgment of the Court of Civil Appeals, holding that the trial court did not exceed its discretion in the alimony award or the division of property. This Court further concluded that the Court of Civil Appeals had improperly reweighed the evidence.
The wife argues that Foley is distinguishable. She notes that according to the opinion of the Court of Civil Appeals in Foley, the wife received an automobile, various personal property and furnishings, and one-half of the proceeds from the sale of three parcels of real property, including the marital residence, in addition to $46,000 from the husband's combined retirement accounts. See Foley v.Foley, 864 So.2d 1091, 1093 (Ala.Civ.App. 2002).
Although it did not so state in its written order, the trial court in this case explained its rationale for the alimony award and the division of the marital property at the conclusion of the proceedings:
 "[TRIAL COURT]: Okay. Having heard the evidence, I am granting their divorce. I am going to base it on incompatibility of temperament and irretrievable breakdown of the marriage. There has been conflicting evidence about whether or not we have adulterous conduct prior to the separation time, but they're certainly incompatible, so I know I can find it from that, so the divorce is granted on those grounds.
 "Now, I'll give them joint legal custody of the children. I am going tell y'all a few things that I observed during the course of this testimony. It appears to me that I have a dad who at times, nothing personal, has been a real jerk about this whole thing. It's just an observation, but there have been problems that the mom has had that I absolutely cannot avoid that are worse than being a jerk at times, so I'll have to place primary physical custody with the dad even though that means I know I will see you here a lot because every time he feels like a jerk she will bring him to court. Maybe we can avoid that in the future. She will have Schedule A visitation.
 ". . . .
 "Additionally no one is to be under the influence of alcohol or drugs in front of these children. I have had ample testimony about each one of you being involved with drug activity at various points in time, so y'all just aren't going *Page 948 
to be under the influence or allow other people to be under the influence in front of your children. They are coming to be of age where they need to be seeing good examples. I am going to order that the husband pay alimony to the wife. I am going to order it in the amount of [$600] a month. I am going credit against that what she would owe him for child support, which is [$307] a month, so I better get out a calculator. That means the net that goes to her is [$293] because then that'll take care of the child support. If he just sends her the [$293] and that recognizes that is child support that she would have been paying. It doesn't make sense for one to pay more than that and the other to make a payment back. That's just silly.
 "Where is that [automobile] right now?
 ". . . .
 "[HUSBAND]: It's in my shop. I've been told that it can be fixed, but it might be a month before they can get to it.
 "[TRIAL COURT]: Okay. The husband is to provide the wife with $2,500 within 30 days time so she may get some type of vehicle. If she is going to be transporting kids around, she needs a vehicle, so within 30 days he is to provide her $2,500 and she can get a vehicle. . . .
 "[TRIAL COURT]: . . . Okay. The property items. I understand there is a marital home. There is a rental home that was their home prior to the one we are calling the marital home and there's a business address?
 "[HUSBAND'S COUNSEL]: Yes. And let me remind Your Honor that on the marital residence and the business, his father is on the mortgage and the note for those and — and the money that he gets out of all the rental property —
 "[TRIAL COURT]: Well, I counted it as part of his income.
 "[HUSBAND'S COUNSEL]: — just about pays the mortgage and the taxes, insurance and what have you.
 "[TRIAL COURT]: I understand. "[WIFE'S COUNSEL]: Judge, I don't believe his father is on that house.
 "[TRIAL COURT]: For the rental house?
 "[WIFE'S COUNSEL]: No, is on the marital house.
 "[HUSBAND]: He had to sign the note.
 "[TRIAL COURT]: Which buildings is she on?
 "[WIFE'S COUNSEL]: The marital home. It's joint.
 "[HUSBAND]: But he had to sign for the loan.
 "[WIFE'S COUNSEL]: I've got a copy of that. I'll find it.
 "[TRIAL COURT]: And if I recall correctly, there's some $130,000 of equity left in the marital home.
 "[WIFE'S COUNSEL]: At least. "[HUSBAND]: I owe —
 "[TRIAL COURT]: I understand. I have $100,000 owed and that a value per an appraisal of $230,000 which leaves $130,000.
 "[HUSBAND]: (Witness nods head.) "[TRIAL COURT]: That was easy math. I was able to do that. I am going to require that the husband pay a property settlement to the wife recognizing some interest in the marital home. I am going to require that he pay her $40,000 in that as property settlement. I will give him 90 days to do whatever financing or whatever he needs to do to get that paid to her. Did I miss anything?
 "[WIFE'S COUNSEL]: What about the business property and the rental property? *Page 949 
 "[TRIAL COURT]: I am awarding those to him because they are making the money that allows him to be able to make certain payments to her and to support the children as well. So I am awarding them to him for those reasons. Thank you. Sometimes I don't say those things. What else?
 "[WIFE'S COUNSEL]: Here's a copy of the mortgage on the marital home and his dad is not on it.
 "[TRIAL COURT]: Well, I made a property award out of that that he owes himself.
 "[HUSBAND'S COUNSEL]: I think what — what we said was his dad signed the note that as the guarantor."
After considering the record on appeal, we conclude that the Court of Civil Appeals properly reversed the trial court's judgment insofar as it divides the marital assets. UnlikeFoley, where the wife received numerous valuable items from the marital estate before the trial court awarded the wife a proportionally small amount of the husband's retirement accounts, the 18.2% of the parties' net worth awarded to the wife in this case represents all she will receive from the marriage. Thus, we agree with the Court of Civil Appeals that given the length of the parties' marriage, the parties' future prospects, and the value of the marital property, the division of which awarded the husband 81.8% of the parties' net worth and awarded the wife 18.2% of the parties' net worth, is inequitable.[3]
Because we find no conflict with the Court of Civil Appeals' judgment and other Alabama caselaw, we affirm the judgment of the Court of Civil Appeals.
AFFIRMED. *Page 950 
SEE, STUART, SMITH, BOLIN, and MURDOCK, JJ., concur.
WOODALL and PARKER, JJ., concur in the result.
LYONS, J., recuses himself.
[1] The record indicates that the birth certificate of the Mullises' first child, who was born before their marriage, shows the mother as "Lynda Mullis."
[2] Hurricane Katrina was a devastating hurricane that made landfall on the Gulf Coast as a Category 3 hurricane on August 29, 2005, causing severe damage.
[3] Although not explicitly stated in its order or at any hearing, a review of the record clearly indicates that the trial court was attempting with its division of the marital property to ensure the best interest of the parties' minor children. Although the trial court is to be commended for its desire to protect the best interest of the minor children by attempting to keep the children in the same or similar circumstances after the divorce as they were in before the divorce, the trial court could and should have fashioned a more equitable division of marital property so that the wife's needs would not be neglected in favor of the children. For example, if the trial court had concerns that the husband would be unable to maintain the marital residence if he was ordered to pay more than $40,000 for the wife's share of the equity in the house, it could have awarded use of the marital residence to the husband until such time as the children are emancipated and then ordered its sale so the parties could receive their proportionate equity. See, e.g., Mattingly v.Mattingly, 541 So.2d 552 (Ala.Civ.App. 1989) (affirming the trial court's judgment awarding possession of the marital residence to the wife until the emancipation of the minor child, at which time the husband was awarded the residence);Chernau v. Chernau, 396 So.2d 1061 (Ala.Civ.App. 1981) (upholding the trial court's judgment awarding the wife use of the marital home until she remarried, at which time it was to be sold and the husband was to receive the greater of one-third of the net proceeds or $38,000); but see Slater v.Slater, 587 So.2d 376 (Ala.Civ.App. 1991) (holding that trial court's order that gave the wife use of the marital residence and allowed continued joint tenancy with right of survivorship of marital residence but that required the sale of the residence upon the emancipation of the minor child, at which time the husband was to be paid one-half of the appraised total equity in the residence at the time of the divorce, was plainly and palpably wrong in that the order limited the wife's ability to sell her interest in the house or to refinance the home loan, it required the wife to protect the husband's equity in the house, and the husband would receive the wife's ownership interest in the house should she die). Similarly, the trial court could have awarded the husband use of the business and rental properties until the children are emancipated if it was concerned that the sale of those properties and the division of proceeds would inhibit the father's ability to adequately support the children.